LEONARD O. ODEN AND VIRGINIA B. ODEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Oden v. Commissioner
Docket No. 2806-79.
United States Tax Court
T.C. Memo 1981-184; 1981 Tax Ct. Memo LEXIS 558; 41 T.C.M. (CCH) 1285; T.C.M. (RIA) 81184; April 20, 1981. *558 Held: Petitioner's basis in his partnership interest does not include the face value of a note allegedly tendered by him to the partnership upon the formation of the partnership. Accordingly, petitioner's claimed partnership loss is disallowed to the extent that such loss exceeds his basis in the partnership interest. Section 704(d). John L. Smith, Jr., for the petitioners. John C. McDougal, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: By letter dated December 13, 1978 respondent determined a deficiency of $ 7,334.88 in petitioners' 1971 Federal income tax. Due to a concession, the issue presented for decision is whether petitioners are entitled to a deduction *560 for losses of the Westland Minerals 1971 Ohio Producers-Oden partnership in an amount in excess of $ 16,250. FINDINGS OF FACT Petitioners Leonard O. Oden and Virginia B. Oden are husband and wife who resided in Norfolk, Virginia at the time of the filing of their petition herein. A timely joint 1971 Federal income tax return was filed by petitioners with the Internal Revenue Service Center, Memphis, Tennessee. Virginia B. Oden is a party herein solely by virtue of her filing a joint return with Leonard O. Oden. Sometime in the early spring of 1971 Leonrd O. Oden (hereinafter sometimes petitioner) was contacted by Gilbert Sharell of Commercial Property Funding Group, Inc., an investment firm, concerning the possibility of investment in an oil and gas drilling venture. Thereafter, petitioner traveled to Kansas where he met Charles Raymond, Chairman of the Board of Westland Minerals Corporation (Westland). Petitioner visited an oil drilling operation in Kansas and was told about a new oil and gas venture to be initiated by Westland in Ohio. In April of 1971 Westland indicated to Sharell who, in turn, notified petitioner that Westland was to contract for the drilling of oil *561 and gas wells and that each well would require a cash investment of $ 65,000 and note funded from production in the amount of $ 75,000. After telephone communications between petitioner and Sharell, petitioner decided that he wanted to invest in the Ohio venture through an investment in a well known as the Chamberlain-Weigand well (Chamberlain well). On May 1, 1971 petitioner met with Sharell and delivered his $ 1,000 check upon which petitioner noted "Deposit 1/4 interest in Chamberlain Well." Since investors were required to pay $ 65,000 cash for the drilling and operation of a well, petitioner was required to invest $ 16,250 for his 25 percent interest in the Ohio venture. Thus, after petitioner delivered his initial $ 1,000 deposit, on May 20, 1971 he executed a note to Westland in the amount of $ 15,250 due June 30, 1971. Up to this point, petitioner received no written evidence of the existence of a partnership. Petitioner satisfied the note by an undated check (number 2909) which was deposited by the payee on July 15, 1971. On July 14, 1971 petitioner executed a power of attorney empowering Westland, inter alia, to execute a limited partnership agreement for petitioner. *562 On the same day a limited partnership agreement was executed by Westland, as general partner, and petitioner, as limited partner, through Westland's use of petitioner's power of attorney. The partnership was named Westland Minerals 1971 Ohio Producers-Oden (hereinafter sometimes Ohio Products). Article IV of the agreement provides in pertinent part: Partnership Capital
1. The Limited Partner shall contribute, to the capital of the Partnership the sum of $ 16,250, such sum to be paid in cash upon the execution of this agreement. 2. The General Partner shall contribute to the capital of the Partnership the fractional undivided working interests in oil and gas leases * * * such interests to be valued at the General Partner's cost therefor. 3. The Limited Partner shall not be required nor obligated to make any additional contribution to the capital of the partnership, it being understood that the drilling of any wells provided for under the terms of this Agreement has been contracted for on a turnkey basis. 4. Additional funds in an amount not to exceed $ 18,750 will be borrowed by the Partnership to finance development of the Properties on a turnkey basis. Said *563 borrowing will be secured solely by the Properties with no personal liability to the Partners. Westland, pursuant to the agreement, transferred one-fourth of its interest in the Chamberlain well to the partnership. The loan mentioned in Article IV, paragraph 4 of the agreement was to be paid from one-half of the partnership's net operating income. Petitioner has not shown that the partnerships borrowed any funds in 1971 to finance the development of the wells. The limited partnership agreement further provided that Rayco, Inc. a wholly-owned subsidiary of the general partner, Westland, would be engaged to develop and operate the well. Although the written partnership agreement was not executed until July 14, 1971 the Chamberlain well, which was the object of the partnership agreement, was completed on May 10, 1971. Charles F. Raymond, Chairman of the Board of Westland, was instrumental in the formulation of numerous alleged "tax shelter" investments, of which petitioner's investment is typical. In 1974, Raymond was indicted on 25 counts by a Grand Jury in the United States District Court for the Eastern District of Pennsylvania. Insofar as here pertinent, Count I of the *564 indictment charged as follows: 1. That beginning from on or about November 1, 1969, and continuing through on or about December 31, 1972, in the Eastern District of Pennsylvania and elsewhere, defendants CHARLES F. RAYMOND, * * * in the offer and sale of securities, namely, investment contracts, * * * and fractional undivided working interests in oil and gas leases involving oil and gas wells in Ohio known as the Westland Ohio 1971 Program, by the use of means and instruments of transportation and communication in interstate commerce and by the use of the mails, directly and indirectly, unlawfully, wilfully and knowingly, did employ a device, scheme and artifice to defraud, and did obtain money and property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and did engage in transactions, practices and courses of business which would and did operate as a fraud and deceit upon purchasers (hereinafter referred to as "Investors") of the above described securities each and all of whom were members of and constituted a class *565 of persons whom the defendant believed could be induced to purchase said securities, all in the following manner: 9. In 1971 defendant CHARLES F. RAYMOND organized and caused to be incorporated under the laws of the state of Ohio a corporation known as Rayco which corporation was a wholly owned subsidiary of WMC and organized for the purpose of drilling and completing Ohio gas wells. 10. During the spring of 1971, exact date unknown to the Grand Jury, defendants RAYMOND, * * * formulated a tax shelter program known as the Westland Ohio 1971 Program. This Program consisted of limited partnership interests in Ohio gas and oil wells, which interests were sold for a total of $ 140,000 per well. Each limited partnership consisted of 1 to 10 public investors (limited partners) and a general partner, (WMC). The limited partners were to contribute a total cash investment of $ 65,000 per well while WMC contributed the lease on which the drilling activities were to be conducted. According to the limited partnership agreement and other selling literature, Rayco, upon execution of the drilling contract, was to receive $ 140,000 in cash to drill and complete each Ohio well. The $ 140,000 *566 was to be provided through the $ 65,000 cash investment and $ 75,000 alleged borrowings by the partnership from a bank or lending agency. The $ 75,000 loan was to be repaid from 50 percent of the production proceeds from each well while the 50 percent balance would go to the investor. 13. Defendants RAYMOND, * * * employed, trained and instructed salesmen * * * to sell the Westland Ohio 1971 Program to investors, especially attorneys, doctors, accountants, and other individuals in the 50 percent or higher income tax bracket whose names were obtained from telephone directories, referrals, and other sources. 14. Throughout the latter part of 1971, defendants RAYMOND, * * * contacted and caused to be contacted numerous broker-dealers in order to sell the Westland Ohio 1971 Program and provided them with sales literature to facilitate sales. 15. In September and October of 1971, defendants RAYMOND, * * * obtained an opinion letter from Lybrand-Ross Bros. and Montgomery (Coopers-Lybrand), a national accounting firm, which letter proportedly [sic] described the financial operations of the Westland Ohio 1971 Program and its income tax consequences, and thereafter caused it to *567 be widely circulated to investors and prospective investors. 16. From May of 1971 through February of 1972 defendants RAYMOND, * * * offered and sold, and caused to be offered and sold to approximately 283 investors in Pennsylvania, New Jersey, Delaware, and other states limited partnership interest in 59 Ohio wells raising approximately 3.5 million dollars in cash in the Westland Ohio 1971 Program. 17. For the purposes of inducing investors to invest and reinvest in the aforesaid Westland Ohio 1971 Program and for obtaining money and property from said investors, defendants distributed and caused to be distributed various sales literature including, but not limited to, a four page pamphlet entitled "WESTLAND MINERALS CORPORATION OHIO GAS PROGRAM". 22. For the purposes of inducing investors to invest in the Westland Ohio 1971 Program, of obtaining money and property from said investors, and of lulling investors into a false sense of security as to the merit and value of their investment, the defendants RAYMOND, * * * made and caused to be made both directly and indirectly false and misleading representations of material facts to the investors and potential investors well knowing *568 at the time that said representations would be and were false and misleading when made, the aforesaid representations including but not limited to the following: (a) that it would cost in excess of $ 100,000 to drill and complete each gas well in Ohio; (b) that Rayco, the drilling contractor, would receive $ 140,000 in cash upon execution of the drilling contract; (c) that WMC, the general partner, would borrow $ 75,000 in cash from a suitable bank or lending institution, which monies would then be transferred to Rayco to drill to completion a well upon the partnership property and execute the necessary documents in support of said loan prior to the end of the taxable year of 1971; (d) that investors' monies would be used only for drilling and completing a well in Ohio and for no other purpose; (e) that all monies raised from investors would be kept in a separate escrow account; (g) that intangible drilling costs were estimated to be $ 128,000; (h) that 50 percent of the proceeds from a well production would be used to satisfy the $ 75,000 loan per well borrowed by WMC, the general partner, from the bank or other suitable lending institution; 23. For the purposes of *569 inducing investors to invest in the aforesaid Westland Ohio 1971 Program, and of obtaining money and property through the sale and offers for sale of these securities, defendants RAYMOND, * * * would and did omit to state material facts and did cause the omission of material facts which were necessary to be stated in order to make the statements made, in light of the circumstances under which they were made, not misleading, including but not limited to the following: (a) that liens existed on Ohio wells of Westland Minerals Corporation; (d) that it was not anticipated that Rayco, the drilling company, would either receive or have access to $ 140,000 in cash upon execution of the drilling contract; (e) that it was not necessary for WMC, the general partner, to borrow $ 75,000 per well to drill and complete each well in Ohio; (f) that the sole purpose of the said alleged "$ 75,000 loan" was to create and present the appearance to investors of an attractive tax shelter program; (g) that the true and accurate cost to sell, drill and complete a well in Ohio was $ 65,000 or less; (h) that the 50 percent of well production proceeds purported to be used to satisfy the $ 75,000 *570 loan was to be the profit to WMC and its subsidiaries; (i) that approximately $ 200,000 of monies raised from investors from the sale of the Ohio 1971 Program would be diverted to satisfy liens and other past due debts of WMC which arose separate and apart from the Westland Ohio 1971 Program; (j) that the Westland Ohio 1971 Program did not qualify as a private placement and was required to be registered with the SEC; (k) that $ 500,000 of monies raised from investors from the sale of the Westland Ohio 1971 Program would be diverted and caused to be diverted by defendants RAYMOND * * * for their own advantage and benefit and for use separate and apart from the Westland Ohio 1971 Program. 24. Defendants CHARLES F. RAYMOND * * * engaged in a transaction, practice and course of business which operated and did operate as a fraud and deceit upon investors by causing $ 500,000 of investors' monies, which were to be used for the drilling of wells in the Westland Ohio 1971 Program to be transferred from the investors' escrow account in the Bank of West Jersey to the Bahamas Saving and Loan Association, Nassau Ltd., Nassau, Bahamas, of which defendant CHARLES F. RAYMOND was Chairman *571 of the Board and thereafter converting these monies for purposes unrelated to the Westland Ohio 1971 Program including but not limited to those for their own personal use, benefit and advantage. 25. Defendant CHARLES F. RAYMOND caused the preparation of 59 falsely made notes in connection with the Westland Ohio 1971 Program to create the appearance of bona fide loans between the Westland Minerals Corporation, the general partner, and the Nassau Bank and Trust, NassauBahamas in the amount of $ 75,000 per note, knowing at the time that no loans existed. Counts II through XXV of the indictment were various mail fraud counts. On May 20, 1975 Raymond pled guilty to all counts of the indictment except Counts XVI and XIX. Raymond was sentenced to 15 months in prison on Count I and received suspended sentences on the other counts. A United States Partnership Information return (Form 1065) was filed by Ohio Producers for the year 1971. The return evidenced an election of the partnership made pursuant to section 263(c)[1] to deduct as expenses all intangible drilling and development costs incurred in the drilling of oil and gas wells. The partnership return reported gross income *572 of $ 669, depreciation of $ 208 and intangible drilling and development expense of $ 31,250. The partnership agreement provided that all partnership losses would be allocated to the limited partner until such time as the limited partner received cash distributions from the partnership. Accordingly, on their Federal income tax return for 1971, petitioners claimed a partnership loss of $ 30,789 in connection with the Ohio Producers partnership. In his notice of deficiency respondent disallowed petitioners' claimed partnership loss to the extent *573 that the loss exceeded petitioners' cash investment of $ 16,250. [2]
OPINION The issue presented for our determination focuses upon the propriety of petitioners' claimed partnership loss of $ 30,789. This loss was mainly attributable to alleged intangible drilling costs deducted by the Ohio Producers partnership pursuant to an election under section 263(c). [3]
Respondent bases his denial of the claimed partnership loss in excess of $ 16,250 on the following grounds: (1) Petitioner has not established that intangible drilling costs in an amount in excess of $ 65,000 were actually incurred in connection with the Chamberlain well. Thus, petitioner, with a one-fourth interest in the well, may not deduct more than $ 16,250 for intangible drilling costs; (2) petitioner, according to respondent, did not acquire an operating interest in the Chamberlain *574 well until after the well had been drilled to production. Thus, respondent relies on Haass v. Commissioner, 55 T.C. 43 (1970) which holds that a working or operating interest in a specific well must be acquired prior to the incursion of drilling and development expenses in order that expenses be deductible to the holder of such an interest; and (3) petitioner has not established that he had a higher basis than $ 16,250 in his partnership interest. Petitioner argues that the issue of the amount of intangible drilling costs incurred by the Ohio Producers partnership was not raised in the notice of deficiency and hence constitutes new matter regarding which the burden of proof rests on respondent. This burden, petitioner asserts, has not been satisfied. Petitioner further maintains that he acquired his partnership interest prior to the time that intangible drilling costs were incurred respecting the Chamberlain well. Petitionr claims that his basis in the Ohio Producers partnership was $ 35,000 and accordingly the claimed partnership loss of $ 30,789 is allowable. We hold for respondent for the reason that petitioner's basis in his partnership interest has not *575 been shown to be greater than $ 16,250 and accordingly any partnership loss in excess of that amount must be disallowed.
Section 722 provides in pertinent part that the basis of an interest in a partnership acquired by a contribution of property, including money, to the partnership shall be the amount of such money and the adjusted basis of such property to the contributing partner at the time of the contribution. A partner's distributive share of partnership loss (including capital loss) shall be allowed only to the extent of the adjusted basis of such partner's interest in the partnership at the end of the partnership year in which the loss occurred. Section 704(d). Petitioner's cash contribution to the Ohio Producers partnership was $ 16,250. Additionally, he argues that he tendered a note for $ 18,750 at the time of the creation of the partnership. Petitioner claims that under section 742 he is entitled to a $ 35,000 basis in his partnership interest. Petitioner's appliation of section 742 *576 to the instant case is in error. That section provides that a transferee's initial basis in his partnership interest is determined under the rules generally applicable to acquisitions of other types of property. See section 1.742.-1, Income Tax Regs. Accordingly, if a partnership interest is purchased or acquired in a taxable exchange, the transferee's basis is his cost under section 1012. Where, however, the partnership interest is acquired by a contribution of property to the partnership, the contributor's basis in the acquired interest is determined by reference to the adjusted basis of the property so contributed. Section 722. See section 1.722-1, Income Tax Regs.
Petitioner urges that we determine that his basis in the Ohio Producers partnership includes the face amount ($ 18,750) of a note allegedly executed and delivered by him to the partnership. Petitioner has not shown that any payments were made on the note during 1971. Petitioner advances an elaborate argument which points to the alleged transfer of his own note to the partnership. He emphasizes *577 that the note created a bona fide indebtedness to the partnership, while he minimizes the importance of the question of whether the note was recourse or nonrecourse. While we agree that it is irrelevant in the present context whether the note was either recourse or nonrecourse, we believe that such irrelevancy stems from the fact that petitioner's basis in his partnership interest is to be determined under section 722. Since petitioner incurred no cost in making the note, its basis to him was zero. Petitioner has not shown that any payments on the note were made in 1971. Thus, pursuant to the mandate of section 722, petitioner is not entitled to increase his partnership basis by the face amount of the allegedly transferred note. Cf. Alderman v. Commissioner, 55 T.C. 662 (1971) (shareholder's personal note had a zero basis for purposes of applying section 357(c)); Rev. Rul. 68-629, 1968-2 C.B. 154 (to the same effect). Se Rev. Rul. 80-235, 1980-35 I.R.B. 7, 8. Accordingly, petitioner is not entitled to deduct any partnership loss in excess of his cash contribution of $ 16,250. Section 704(d). Other arguments aired by the parties are *578 rendered moot by our holding above and thus we do not address them. Decision will be entered for the respondent. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect for the year in issue. Section 263(c) provides: (c) Intangible Drilling and Development Costs in the Case of Oil and Gas Wells. -- Notwithstanding subsection (a), regulations shall be prescribed by the Secretary or his delegate under this subtitle corresponding to the regulations which granted the option to deduct as expenses intangible drilling and development costs in the case of oil and gas wells and which were recognized and approved by the Congress in House Concurrent Resolution 50, Seventy-ninth Congress.↩
2. Respondent's disallowance of $ 14,539 of petitioners' claimed loss was detailed as follows in the notice of deficiency: ↩
Cash Investment in Partnership 5/1/71
$ 1,000
7/15/71
15,250
Total Cash Investment
16,250
Loss Claimed Per Return
30,789
Decrease in Amount of Loss
$ 14,539
3. Supra↩, footnote 1.