T.C. Memo. 1996-35


UNITED STATES TAX COURT


DAKOTAH HILLS OFFICES LIMITED PARTNERSHIP,
AN ARIZONA LIMITED PARTNERSHIP,
WILLIAM M. AND DIANNE B. STEPHENS,
TAX MATTERS PARTNERS, ET AL.,[1] Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 18955-93, 18956-93,Filed January 30, 1996.
            18962-93, 18963-93,
            18965-93, 18990-93,
            18992-93, 18993-93,
            19067-93.

---

[1]Cases of the following petitioners are consolidated herewith:  Pavilion II Limited Partnership, An Arizona Limited Partnership, William M. and Dianne B. Stephens, Tax Matters Partners, docket No. 18956-93; Copper Crest I Limited Partnership, an Arizona Limited Partnership, William M. and Dianne B. Stephens, Tax Matters Partners, docket No. 18962-93; Dakotah Hills Retail Limited Partnership, an Arizona Limited Partnership, William M. and Dianne B. Stephens, Tax Matters Partners, docket No. 18963-93; Club Carmel Limited Partnership, an Arizona Limited Partnership, William M. and Dianne B. Stephens, Tax Matters Partners, docket No. 18965-93; Pio Decimo II Limited Partnership, An Arizona Limited Partnership, William M. and Dianne B. Stephens, Tax Matters Partners, docket No. 18990-93; Ina Thornydale Limited Partnership, an Arizona Limited Partnership, William M. and Dianne B. Stephens, Tax Matters Partners, docket No. 18992-93; Ironwood Manufacturing Ltd., An Arizona Limited Partnership, William M. and Dianne B. Stephens, Tax Matters Partners, docket No. 18993-93; and Vail Commerce Center Limited Partnership, an Arizona Limited Partnership, William M. and Dianne B. Stephens, Tax Matters Partners, docket No. 19067-93.

George Tomas Rhodus, for petitioners.

James E. Archie, for respondent.


MEMORANDUM OPINION

WHALEN, Judge: These nine consolidated cases are before the Court to decide Petitioners' Motion for Summary Judgment filed pursuant to Rule 121, Tax Court Rules of Practice and Procedure. All Rule references are to the Tax Court Rules of Practice and Procedure.

Each of the subject cases is a partnership action, as defined by Rule 240(b)(2), that involves a limited partnership. Respondent issued a notice of final partnership administrative adjustment (FPAA) to each partnership stating that an adjustment to the partnership's income would be made due to an "IRC Section 752(b) Distribution". Unless stated otherwise, all section references are to the Internal Revenue Code, as amended and in effect during 1989. The adjustment determined by respondent in each case is as follows:

| Partnership | Adjustment |
|---|---|
| Dakotah Hills Offices Ltd. Partnership | $385,519 |
| Pavilion II Ltd. Partnership | 432,084 |
| Copper Crest I Ltd. Partnership | 181,371 |
| Dakotah Hills Retail Ltd. Partnership | 972,812 |
| Club Carmel Ltd. Partnership | 234,902 |
| Pio Decimo II Ltd. Partnership | 2,685,926 |
| Ina Thornydale Ltd. Partnership | 480,813 |

| Ironwood Manufacturing Ltd. Partnership | 918,765 |
| Vail Commerce Center Ltd. Partnership | 417,156 |

Petitioners' motion asserts that none of the above adjustments involves a "partnership item" as that phrase is defined by section 6231. Therefore, petitioners' motion asks the Court to dismiss all of the subject cases on the ground that the Court does not have jurisdiction to readjust nonpartnership items in these proceedings commenced under the unified partnership litigation procedures set forth in sections 6221 through 6233, inclusive.

Background

According to Petitioners' Motion for Summary Judgment, the operative facts in each of the nine consolidated cases are similar, and are set forth in the pleadings and the revenue agent's reports attached to petitioners' motion. After argument was heard on petitioners' motion, the parties submitted a Stipulation of Facts, together with various documents attached as exhibits. We have taken the facts set forth in this opinion from the pleadings, Petitioners' Motion for Summary Judgment, and the Stipulation of Facts and attached exhibits filed by the parties.

For purposes of our consideration of Petitioners' Motion for Summary Judgment, the parties have not presented to the Court all of the documents that are pertinent to each of the nine cases. They have attached as exhibits to the stipulation several categories of documents that relate to each petitioner. These include the partnership agreement for each partnership, the U.S. Partnership Return of Income filed on Form 1065 by each partnership for taxable year ending December 31, 1989, and the FPAA issued by respondent to each partnership. They have also attached as exhibits to the stipulation certain other documents that relate to one of the partnerships, Dakotah Hills Offices Limited Partnership, in the case of docket No. 18955-93 (Dakotah Hills). As we read the Stipulation of Facts, the parties intend the Dakotah Hills documents as exemplars of the documents executed with respect to all of the cases. In the following discussion, we have focused on the facts in the Dakotah Hills case, and references to the partnership are references to Dakotah Hills.

Dakotah Hills was formed by a group of four general partners, Mr. David Randall Jenkins, Ms. Renee Jenkins, Mr. Timothy Lee Shaftel, and the JNC Companies, an Arizona corporation. It was established on or about October 25, 1984, pursuant to the Uniform Limited Partnership Act of the State of Arizona, when the Agreement

and Certificate of Limited Partnership of Dakotah Hills was filed with the Arizona Secretary of State (partnership agreement). It was established to acquire a parcel of property from another partnership with the same general partners, Sierra Sunrise Limited Partnership, and to complete the construction of an office building on the property for the purpose of leasing the office building to one of its general partners, the JNC Companies. The property consisted of approximately 1.113 acres of land located in the metropolitan Tucson, Arizona, area. As part of the transaction, the seller agreed to assign to Dakotah Hills a lease of the office building to the JNC Companies for a term of 7 years with an option to renew for 3 years. A stated objective of the limited partnership was to hold the real property until the expiration of the lease and then to sell it at a gain.

In addition to the capital contributed by the four general partners, in the aggregate amount of $1,000, Dakotah Hills was capitalized by the sale of 35 units of limited partnership interest for $26,000 per unit. The purchaser of each limited partnership unit paid $5,200 in cash and issued a promissory note for the balance of the principal amount of $20,800. The promissory note was payable to the partnership, without interest, in four annual installments of $5,200 each commencing on October 1,

1985. In this opinion, we refer to these promissory notes as investor notes or as capital contribution notes.

As security for the payment of the investor notes, each investor was required to execute a security agreement which gave the partnership a security interest in his or her partnership interest. The partnership's security interest in each unit of limited partnership interest was recorded by the filing of a Uniform Commercial Code financing statement that was also executed by the investor.

The sale of units of limited partnership interest in Dakotah Hills was preceded by the circulation of a confidential private offering memorandum dated August 17, 1984 (private offering memorandum). The private offering memorandum states that the partnership intended to use the investor notes as collateral for a loan, the proceeds of which would be used to acquire partnership property. The private offering memorandum describes the intended use of the investors' notes, in part, as follows:

> Leveraging. Immediately after the formation
> of the partnership, the partnership intends
> to obtain a loan from a bank, savings and loan
> association and/or other institutional lender
> in order to obtain the necessary funds with
> which to purchase the partnership property.
> The General Partners, based upon their past
> financing experiences, believe that they will
> be in a position to use the partnership property
> and the promissory notes, to be executed by all
> the Limited Partners, as collateral for a loan.
> Also in accordance with their prior financing

experiences, the General Partners expect that the lender will require the partnership to obtain a financial guarantee bond from an insurance company acceptable to the lender. The insurance company will then, as surety, obligate itself to pay the lender should any of the Limited Partners default in making payments under the provisions of their respective promissory notes.

      \*    \*    \*    \*    \*    \*    \*

Institutional Financing. Immediately after the formation of the partnership, the partnership intends to use the partnership property and the promissory notes given by the Limited Partners as part of their capital contribution as security for a loan. Since the loan proceeds are necessary in order to obtain the partnership property, a simultaneous closing of the institutional loan and the acquisition of the partnership property will probably have to be arranged. The partnership expects to borrow Five Hundred Thirteen Thousand and No/100 Dollars ($513,000) and expects to pay three (3) percentage points in order to obtain the loan. In addition, the partnership objects [expects] the institutional lender to require the issuance of a financial guarantee bond prior to the issuance of the loan. Certain expenses are projected in obtaining the financial guarantee bond. Based upon the General Partners' prior experience in obtaining financial guarantee bonds, the partnership expects to pay two (2) percentage points per year for the financial guarantee bonds and plans to incur some significant legal expenses in obtaining the bond commitment. As set forth in the "Use of Proceeds" section, Forty-Two Thousand and No/100 Dollars ($42,000.00) has been budgeted for this expense.

The Dakotah Hills partnership agreement also describes the

partnership's intent on this point as follows:

Use of Promissory Notes. Immediately upon the formation of the partnership, the partnership

intends to assign all of the promissory notes issued by Limited Partners to purchase units of limited partnership interests to a bank and/or savings and loan association in order to raise operating capital for the limited partnership. The intent is to borrow as much as possible by using the promissory notes as collateral. If the partnership is successful in assigning the promissory notes and security agreements to a bank and/or savings and loan association, as it intends to do, the bank and/or savings and loan association will then be the holder of the promissory note and security agreement and the limited partners may be obligated to make all payments of interest and principal due on the promissory notes to the bank and/or savings and loan association despite certain claims that the limited partner may have or may want to assert against the General Partners and/or the partnership.

As contemplated by the above, shortly after Dakotah Hills was formed, it borrowed $520,000 from Northern Telecom International Finance B.V. (Northern Telecom) and issued its promissory note to Northern Telecom in the principal amount of $520,000 payable in four installments as follows:

| Due Date | Amount |
|----------|--------------|
| 12/1/85 | $190,233.33 |
| 12/1/86 | 182,000.00 |
| 12/1/87 | 182,000.00 |
| 12/1/88 | 182,689.00 |
| Total | 736,922.33 |

As collateral for the loan, Dakotah Hills negotiated, pledged, and assigned all of the investor notes, in the

aggregate principal amount of $728,000, to Northern Telecom.

Dakotah Hills' promissory note to Northern Telecom required it to notify each investor of the assignment of his or her investor note and to direct each investor to make payments to a non-interest bearing account maintained by Northern Telecom.  In satisfaction of that requirement, every investor who purchased a unit of limited partnership interest in Dakotah Hills executed a letter to Northern Telecom that made reference to Dakotah Hills' promissory note to Northern Telecom in the principal amount of $520,000, to the investor note issued to Dakotah Hills (referred to in the letter as "Borrower's Note"), and to "the Surety Bond securing the Borrower's obligations under the Borrower's note issued by Admiral Insurance Company".  In the letter, the investor agreed to make all payments under the investor note directly to Northern Telecom.  The letter also states as follows:  "THE BORROWER'S NOTE IS A NEGOTIABLE INSTRUMENT AND WILL BE ENDORSED TO NTIF [i.e., Northern Telecom] AS PARTIAL SECURITY FOR PAYMENT BY THE PARTNERSHIP OF THE PARTNERSHIP NOTE."

Each investor note contains the following statement:

> THIS NOTE IS A NEGOTIABLE INSTRUMENT AND, EITHER ALONE OR IN CONJUNCTION WITH OTHER NOTES PAYABLE TO THE PAYEE, WILL BE PLEDGED BY THE PAYEE TO SECURE LOANS.  THE CONSENT OF THE

UNDERSIGNED IS HEREBY GRANTED TO THE PAYEE AND ITS ASSIGNEE OR PLEDGEE FOR ANY ASSIGNMENT OR PLEDGE.

All of the investor notes were endorsed by Dakotah Hills "PAY TO THE ORDER OF NORTHERN TELECOM INTERNATIONAL FINANCE B.V." and were delivered to Northern Telecom along with an assignment to Northern Telecom of the partnership's interest in the security agreements that had been executed by the limited partners.

As contemplated by the private offering memorandum and the letter issued by each limited partner to Northern Telecom, Dakotah Hills purchased a financial guaranty bond from Admiral Insurance Co. (Admiral).  The guaranty bond provided that in the event any limited partner defaulted on his or her obligations under the investor note, Admiral agreed to pay to Northern Telecom the amount due under the investor note.  Under the terms of the financial guaranty bond, after Northern Telecom received payment of the principal amount payable under a defaulted investor note, it was required to deliver the investor note and the investor's security agreement to Admiral.

Dakotah Hills also entered into a partnership indemnity agreement with Admiral under which Dakotah Hills agreed to indemnify Admiral against any loss on the financial guaranty bond.  The partnership's obligation

under the indemnity agreement was secured by a deed of trust and assignment of rents with respect to the real property owned by the partnership.

At some point, some or all of the limited partners of Dakotah Hills ceased to pay their investor notes, and they refused Northern Telecom's demand for payment. Accordingly, Northern Telecom demanded payment from Admiral pursuant to the terms of the financial guaranty bond, and Admiral paid the outstanding balance of the defaulted investor notes. Admiral then sued the individual limited partners who had defaulted for collection of their investor notes, and the investors countersued Admiral, alleging that they had been fraudulently induced to enter into the partnership and that Admiral was a party to the fraud.

In 1987, Dakotah Hills filed for protection under chapter 11 of the U.S. bankruptcy laws. On or about June 20, 1989, Admiral filed its First Amended Proof of Claim in Dakotah Hills' bankruptcy. Admiral's claim states as follows:

> Through rights of subrogation and through direct liability pursuant to that certain Indemnity Agreement from Debtor attached hereto, the Debtor is indebted or liable to this Claimant in the sum of $367,142.68 (the "Specific Claim"), plus accrued and accruing interest, costs and attorneys' fees. This sum includes approximate legal and professional fees and expenses as of March 31, 1989, and principal, interest and salvage payments of $372,233.32. The liability

        of Debtor may be reduced further by any future
        payments received by Claimant from limited
        partners of Debtor.


    Dakotah Hills was only one of approximately 42
partnerships and corporations related to the JNC Companies
and Mr. David Randall Jenkins that filed for protection
under the bankruptcy laws.  All of the cases were jointly
administered by the Bankruptcy Court, and a single trustee
in bankruptcy was appointed.  Admiral was the largest
creditor of the JNC estates and filed claims totaling
approximately $79 million.

    On or about November 10, 1989, Admiral and three law
firms representing investors in various JNC partnerships
executed a Settlement Agreement under which Admiral and any
investors who joined the agreement could settle their legal
claims against one another.  The preamble of the agreement
refers to an attached list of law suits "pending in the
United States District Court for the District of Arizona
and/or the Arizona Superior Court in which Admiral has
asserted claims against Investors and Investors have
asserted claims against Admiral."  It appears that some of
the limited partners of Dakotah Hills were parties to a
suit against Admiral, but the record does not disclose
whether all of the limited partners of Dakotah Hills were
parties to such a lawsuit.  The same is true of the limited

partners in the other partnerships.  The preamble of the Settlement Agreement also refers to a list of proceedings "pending in the United States Bankruptcy Court for the District of Arizona."  It appears that the list of bankruptcy proceedings includes proceedings filed on behalf of seven of the nine partnerships involved in the consolidated cases herein.

Under the Settlement Agreement, an investor is given until December 31, 1989, to elect one of two options.  The first option provides as follows:

> Commencing on the later of (i) January 1, 1990, or (ii) the effective date of any enacted statutory provisions amending the Internal Revenue Code to provide for preferential treatment with respect to the gain arising from the sale or exchange of a capital asset, the Investors' shall abandon their interests in the JNC Partnerships by conveying them to the Trustee, and thereafter, the Investors' promissory notes that are the subject of claims by Admiral against the Investors or are otherwise held by Admiral shall be returned to the Investors.  The return of the Investors' promissory notes is intended as a purchase price reduction within the meaning of I.R.C. Section 108(e)(5). * * *

The second option provides as follows:

> Immediately after the conclusion of the bankruptcy proceedings, the Investors shall convey their interests in the JNC Partnerships to the Trustee; and all promissory notes executed by the Investors that are the subject of claims by Admiral against the Investors or are otherwise held by Admiral shall be returned to the

> Investors. The return of the Investors'
> promissory notes is intended as a purchase price
> reduction within the meaning of I.R.C. Section
> 108(e)(5).

Under the Settlement Agreement, therefore, an investor could "abandon" his or her interest or interests in the partnership "by conveying them to the Trustee", or the investor could elect to "convey" his or her interest or interests in the partnership to the trustee. In either event, the investor's promissory note would be returned. Under the Settlement Agreement, the investor also assigned any claims he or she had against third parties to Admiral and agreed to a division of any moneys distributed from a court fund.

An integral part of the Settlement Agreement was the undertaking by Admiral and the investors who joined the agreement to obtain the approval of the trustee and the Bankruptcy Court to another agreement between and among the trustee and the investors. Under that agreement, the trustee would agree to accept any limited partnership interests that were abandoned pursuant to the terms of the Settlement Agreement, and the parties agreed to mutually release all claims they might have against each other. The agreement also provides as follows:

> 10. Investors agree to seek a "test case"
> determination letter or a private letter ruling

from the Internal Revenue Service regarding the tax consequences of the abandonment of certain interests in one of the Partnerships by one of the Investors (the "abandonment issue"). Investors shall be responsible for submitting the request for a determination letter or private letter ruling and shall bear the cost of filing that request.  Trustee agrees to cooperate with Investors and their attorneys in connection with the filing of the request, and Investors agree to keep Trustee apprised as to the status of the request.

11.   Trustee and Investors agree that Trustee shall file federal and state income tax returns for the partnerships consistent with any determination letter or private letter ruling issued by the Internal Revenue Service regardless of whether that determination letter or ruling concludes that the abandonment of the Partnership interests by certain of the Investors gives rise to capital gain to the abandoning partners (Investors).

12.   Except as provided in paragraph 12 hereof, with respect to the filing of a motion under 11 U.S.C. § 505(b), Trustee and Investors agree that Trustee shall have no responsibility, including no financial responsibility, with respect to a Partnership audit proceeding which deals with the abandonment issue, including any administrative or judicial appeals of an adverse "final partnership administrative adjustment" dealing with the abandonment issue.  Trustee also shall have no responsibility for appealing or contesting any Internal Revenue Service determination letter or ruling dealing with the abandonment issue which is adverse to the Investors.

13.   Trustee and Investors agree that in the event that the Internal Revenue Service declines to issue a determination letter or ruling on the abandonment issue or Investors' attorneys withdraw the request after mutual agreement with the Trustee, then Trustee shall prepare and file the partnerships' federal and state income tax returns recognizing that the abandonments result in the withdrawal of the abandoning partners from

the partnerships for federal income tax purposes, provided that a reasonable basis exists for that return position.

In the event that the Internal Revenue Service declines to issue a determination letter or ruling on the abandonment issue or Investors' attorneys withdraw the request after mutual agreement with the Trustee, the Trustee may file a motion pursuant to 11 U.S.C. § 505 (b) for a prompt audit of the partnerships' tax returns.

Ultimately, the trustee entered into the agreement with the investors, and the agreement was approved by the Bankruptcy Court. The record does not disclose what action, if any, was taken to seek a ruling from the Internal Revenue Service as contemplated in the passages of the agreement, quoted above, or what action, if any, was taken by the Internal Revenue Service.

The Form 1065, U.S. Partnership Return of Income, filed on behalf of Dakotah Hills for calendar year 1989 includes balance sheets as of the beginning and end of the year on Schedule L. Line 5 of Schedule L includes the following "Other current assets":

|  | Beginning | Ending |
|---|---|---|
| Notes receivable--investors | $192,400 | $192,400 |

Line 12 of Schedule L includes the following "Other assets":

|  | Beginning | Ending |
|---|---|---|

Notes receivable--investors  $182,000    $182,000

According to Dakotah Hills' 1989 return, the following persons held an interest in the partnership:

| Partner | Interest | Joined Settlement | Sec. 752 Adjustment | Liabilities | Beginning Capital | Ending Capital |
|---|---|---|---|---|---|---|
| Bankruptcy Estate of D. R. Jenkins | 0.0500% | | | $8,363 | ($337) | ($397) |
| Bankruptcy Estate of Renee Jenkins | 0.0500% | | | 8,363 | (337) | (397) |
| Bankruptcy Estate of Tim Shaftel | 0.0500% | | | 8,363 | (336) | (396) |
| The JNC Companies | 0.8502% | | | 142,210 | (5,727) | (6,751) |
| Stanford Bienias | 2.8290% | 2.8290% | $16,700 | 10,699 | 4,100 | 696 |
| Stephen K. and Lindy Brigham | 2.8290% | 2.8290% | 16,700 | 10,699 | 4,100 | 696 |
| Courtney Investment Co. | 2.8290% | | | 10,699 | 4,100 | 696 |
| Vito and Christine Del Deo | 2.8290% | 2.8290% | 16,700 | 10,699 | 4,100 | 696 |
| Philip De Marie | 5.6580% | | | 21,398 | 8,201 | 1,391 |
| Bert and Ann Ferganchick | 8.4850% | 8.4850% | 50,083 | 32,089 | 12,317 | 2,105 |
| Eugene W. and Leta Marie Friesen | 2.8290% | | | 10,699 | 4,100 | 696 |
| Bankruptcy Estate of D. R. Jenkins | 1.4145% | | | 5,349 | 2,049 | 347 |
| The JNC Companies | 9.8992% | | | 37,437 | 14,079 | 2,164 |
| Gary Johnson | 2.8290% | 2.8290% | 16,700 | 10,699 | 4,100 | 696 |
| Woodrow J. Johnson | 2.8290% | 2.8290% | 16,700 | 10,699 | 4,100 | 696 |
| Scott W. Langlee | 1.4142% | 1.4142% | 38,682 | 5,348 | 2,918 | 1,216 |
| Antonio and Yolanda Leon | 2.8290% | | | 10,699 | 4,101 | 697 |
| Henry L. Leyva | 2.8290% | | | 10,699 | 4,100 | 696 |
| Belverd E. Needles | 2.8290% | 2.8290% | 16,700 | 10,699 | 4,100 | 696 |
| Hartley E. Newkirk | 0.0000% | | | 5,336 | 2,076 | -0- |
| Peter D. Beren | 0.0000% | | | 5,336 | 2,076 | -0- |
| R. Luther and Roberta Rae Olson | 2.8290% | | | 10,699 | 4,100 | 696 |
| Donald T. and Karen R. Pierce | 2.8290% | | | 10,699 | 4,100 | 696 |
| Carroll A. and Marilyn Rinehart | 5.6570% | 5.6570% | 33,393 | 21,394 | 8,207 | 1,399 |
| Bankruptcy Estate of Tim Shaftel | 2.8290% | | | 10,699 | 4,100 | 696 |
| William M. and Diane Stephens | 5.6570% | 5.6570% | 33,393 | 21,394 | 8,207 | 1,399 |
| George S. and Beverly M. Wilson | 2.8290% | 2.8290% | 16,700 | 10,699 | 4,100 | 696 |
| John S. Woodbridge II | 2.8290% | | | 10,699 | 4,100 | 696 |
| Harry Orville Woody | 2.8290% | | | 10,699 | 4,100 | 696 |
| Douglas J. Bol | 1.4142% | 1.4142% | 39,837 | 5,348 | 1,763 | 61 |
| Andrew W. Richardson | 1.4142% | 1.4142% | 39,838 | 5,348 | 1,762 | 60 |
| Stephen J. Moddelmog | 2.8290% | | | 10,699 | 4,101 | 697 |
| Victor Montgomery | 5.6570% | 5.6570% | 33,393 | 21,394 | 8,207 | 1,399 |
| Bankruptcy Estate of Renee Jenkins | 1.4145% | | | 5,349 | 2,050 | 348 |
| Admiral Insurance Company | 2.8220% | | | 10,699 | -0- | 759 |
| | 100.0000% | 49.5016% | 385,519 | 552,401 | 136,877 | 16,541 |

The FPAA issued to Dakotah Hills states that
respondent determined an adjustment to the partnership's
1989 return in the amount of $385,519.  It describes the
nature of that adjustment as follows:

  IRC Section 752(b) Distribution

It has been determined that the discharge of liability on the partners' capital contribution notes in 1989 resulted in a partnership distribution pursuant to Internal Revenue Code Section 752(b).

A more detailed description of respondent's determination is set forth in the Form 4605-A, Examination Changes--Partnerships, Fiduciaries, S Corporations, and Interest Charge Domestic International Sales Corporations, dated January 26, 1993, that was prepared by the revenue agent who audited Dakotah Hills and the other limited partnerships.  In this opinion, we refer to this form as the RAR.

According to the RAR, each of the 14 limited partners of Dakotah Hills who joined the Settlement Agreement was relieved of the obligation of paying his or her "capital contribution note" and, in effect, was relieved of liability for a portion of the partnership's nonrecourse debt.  According to the RAR, this decrease in each partner's share of partnership liabilities is a constructive distribution of money, pursuant to section 752(b).  The RAR describes the effect of the constructive distribution to the investors, as follows:

After considering the discharge of their capital contribution notes, Investors had no out of pocket capital contribution and no further obligation to make any future capital contribution.  Therefore, after following the

annual basis adjustments for partnership distributive items, pursuant to IRC Sect. 705., the net effect of the investor note discharge, to each limited partner, is in general, a recapture under IRC 731(a)(1) of the net balance of all previously distributed tax losses and capital distributions. The constructive distribution pursuant to IRC 752(b) results in a negative (IRC 733) basis adjustment to partners, which brings basis back to zero (but not below zero) prior to 12/31/89.

The RAR includes the following schedule to show how the adjustment in the amount of $385,519 was computed:

Dakotah Hills Office Limited Partnership Schedule of Basis Computation

|  | Initial Basis | Loss Distribution | Difference | Sec. 733 Basis Reduction | Adj. Basis After Reduction |
|---|---|---|---|---|---|
| Langlee, Scott W. | $41,600 | $38,682 | $2,918 | $2,918 | -- |
| Needles, Belverd E. | 20,800 | 16,700 | 4,100 | 4,100 | -- |
| Wilson, George S. & Beverly M. | 20,800 | 16,700 | 4,100 | 4,100 | -- |
| Brigham, Stephen K & Lindy | 20,800 | 16,700 | 4,100 | 4,100 | -- |
| Del Deo, Vito & Christine | 20,800 | 16,700 | 4,100 | 4,100 | -- |
| Bienias, Stauford | 20,800 | 16,700 | 4,100 | 4,100 | -- |
| Rinehart, Carroll A & Marilyn J. | 41,600 | 33,393 | 8,207 | 8,207 | -- |
| Richardson, Andrew W. | 41,600 | 39,838 | 1,762 | 1,762 | -- |
| Bol, Douglas J. | 41,600 | 39,837 | 1,763 | 1,763 | -- |
| Ferganchick, Bert & Ann | 62,400 | 50,083 | 12,317 | 12,317 | -- |
| Johnson, Gary | 20,800 | 16,700 | 4,100 | 4,100 | -- |
| Stephens, William M. & Dianne B. | 41,600 | 33,393 | 8,207 | 8,207 | -- |
| Montgomery, Victor | 41,600 | 33,393 | 8,207 | 8,207 | -- |
| Johnson, Woodrow J. | 20,800 | 16,700 | 4,100 | 4,100 | -- |
|  | 457,600 | 385,519 |  |  |  |

## Discussion

All of the adjustments at issue in these consolidated cases are based upon the fact that the limited partners who joined the Settlement Agreement with Admiral obtained the cancellation of their investor notes. Respondent determined that each of those partners thereby realized a decrease in his or her share of partnership liabilities.

Respondent treated the amount of that decrease as a distribution of money to the settling partner by the partnership, pursuant to section 752(b).

Petitioners' Motion for Summary Judgment asks the Court to dismiss the subject consolidated cases on the ground that the adjustments do not involve "partnership items" as defined by section 6231(a)(3). Petitioners take the position that the Settlement Agreement between Admiral and 14 limited partners took place entirely outside of the partnership, such that the determination of any item relating to that transaction could not be a partnership item within the meaning of section 6231(a)(3) and the regulations promulgated thereunder.

In order to decide a motion for summary judgment, we must find that the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law. Rule 121(b). The moving party bears the burden of proving that there is no genuine issue of fact and that the moving party is entitled to judgment on the substantive issues of the case as a matter of law. E.g., O'Neal v. Commissioner, 102 T.C. 666, 674 (1994). In considering a motion for summary judgment, we view factual inferences in the light

most favorable to the party opposing the motion. <u>Blanton</u> <u>v. Commissioner</u>, 94 T.C. 491, 494 (1990).

At the outset, we note that petitioners do not take the position that an adjustment involving a constructive distribution of money pursuant to section 752(b), based upon a decrease in a partner's share of partnership liabilities, can never, as a matter of law, be a partnership item within the meaning of section 6231(a)(3). Rather, petitioners argue that the adjustments determined in these cases, as described in the RAR, cannot be partnership items.

In order to analyze petitioners' argument, it is necessary to review the definition of a partnership item. Section 6231(a)(3) defines a "partnership item" as follows:

> The term "partnership item" means, with respect to a partnership, any item required to be taken into account for the partnership's taxable year under any provision of subtitle A to the extent regulations prescribed by the Secretary provide that, for purposes of this subtitle, such item is more appropriately determined at the partnership level than at the partner level.

The regulations promulgated under section 6231(a)(3) make clear that the determination of a partner's share of partnership liabilities is a partnership item. Section 301.6231(a)(3)-1(a), Proced. & Admin. Regs., provides as follows:

the following items which are required to be taken into account for the taxable year of a partnership under subtitle A of the Code are more appropriately determined at the partnership level than at the partner level and, therefore, are partnership items:

     (1)  The partnership aggregate and each partner's share of the following:

       *   *   *   *   *   *   *

     (v)  Partnership liabilities (including determinations with respect to the amount of the liabilities, whether the liabilities are nonrecourse, and changes from the preceding taxable year) * * *

The regulations promulgated under section 6231(a)(3) also make clear that items related to certain transactions, including contributions to the partnership, distributions from the partnership, and transactions to which section 707(a) applies, are partnership items, at least in certain cases.  Section 301.6231(a)(3)-1(a)(4), Proced. & Admin. Regs., provides as follows:

     (4)  Items relating to the following trans- actions, to the extent that a determination of such items can be made from determinations that the partnership is required to make with respect to an amount, the character of an amount, or the percentage interest of a partner in the partner- ship, for purposes of the partnership books and records or for purposes of furnishing information to a partner:

     (i)  Contributions to the partnership;

(ii) Distributions from the partnership; and

(iii) Transactions to which section 707(a) applies (including the application of section 707(b)).

The regulations do not spell out all of the possible items that can be related to such transactions. Rather, as quoted above, the regulations state that any such related items are partnership items, to the extent that a determination of such items can be made from determinations that the partnership is required to make for purposes of the partnership books and records or for purposes of furnishing information to a partner. Sec. 301.6231(a)(3)-1(a)(4), Proced. & Admin. Regs. In the case of a distribution from the partnership, the regulations state that, for purposes of a partnership's books and records or for purposes of furnishing information to a partner, the partnership needs to determine the character of the amount transferred to a partner, the amount of money distributed to a partner, the adjusted basis to the partnership of the distributed property, and the character of the partnership property. Sec. 301.6231(a)(3)-1(c)(3)(i), (ii), and (iii), Proced. & Admin. Regs.

As explained above, an item is a partnership item to the extent that a determination of the item can be made from these and similar determinations that the partnership

is required to make.  However, the regulations provide that if other information is required to determine the item, then it is not a partnership item.  These rules are set forth in section 301.6231(a)(3)-1(c)(3), Proced. & Admin. Regs., which provides as follows:

> To the extent that a determination of an item relating to a distribution can be made from these and similar determinations that the partnership is required to make, therefore, that item is a partnership item. To the extent that that determination requires other information, however, that item is not a partnership item. Such other information would include those factors used in determining the partner's basis for the partnership interest that are not themselves partnership items, such as the amount that the partner paid to acquire the partnership interest from a transferor partner if that transfer was not covered by an election under section 754.

This brings us back to petitioners' argument in these cases.  Petitioners seize upon the statement in the above regulation that an item is not a partnership item to the extent that a determination of the item requires informa-tion other than the information necessary to make a required determination, and they argue as follows:

> under the facts and circumstances of these cases, the §752(b) adjustment--if any such adjustment is proper at all--must be made at the level of the individual partner because "the determination requires other information", i.e., facts not in the possession or control of the partnership. REGS. §301.6231(a)(iii)-1(c)(3), supra.  [Sic.]

The focus of petitioners' legal analysis is on section 301.6231(a)(3)-1(a)(4), Proced. & Admin. Regs., and the illustration of those rules contained in section 301.6231 (a)(3)-1(c)(3), Proced. & Admin. Regs. Petitioners assert that under those provisions, an item relating to a distribution from the partnership is defined as a nonpartnership item to the extent that a determination of that item requires "other information". Sec. 301.6231(a)(3)-1(c)(3), Proced. & Admin. Regs. According to petitioners, the settlement transaction in this case took place between Admiral and each individual limited partner who joined the Settlement Agreement, and any item relating to that transaction would require "information from either Admiral or the individual partners regarding the settlement". Petitioners assert that any such item would not be a partnership item because it requires information that is "not in the possession or control of the partnership."

We disagree with petitioners' legal analysis and with the underlying factual premise of that analysis. Contrary to petitioners' position, the determination of whether an item is a partnership item does not depend upon whether the item is determinable from information actually available at the partnership level. Cf. Dial U.S.A., Inc. v. Commissioner, 95 T.C. 1, 4 (1990) (defining a subchapter S corporation item). The critical factor is whether the

partnership was required to make a determination of that item.  Id.

As mentioned above, the regulations require a partnership to determine the partnership aggregate and each partner's share of "Partnership liabilities (including determinations with respect to * * * changes from the preceding taxable year)".  Sec. 301.6231(a)(3)-1(a)(1)(v), Proced. & Admin. Regs.  The determination of the items at issue in this case, the amount of money treated as a distribution to the partner by the partnership under section 752(b), flows automatically from the determination that partnership liabilities have decreased from the preceding taxable year.  Accordingly, in view of section 301.6231(a)(3)-1(a)(1)(v), Proced. & Admin. Regs., which requires the partnership to determine the partnership aggregate and each partner's share of partnership liabilities, including changes from the prior year, we conclude that the determination of a constructive distribution of money under section 752(b) that is brought about by a decrease in a partner's share of the liabilities of a partnership is also a partnership item.

Petitioners do not discuss section 301.6231(a)(3)-1(a)(1)(v), Proced. & Admin. Regs.  Rather, as mentioned above, petitioners focus their argument on the rules set forth in section 301.6231(a)(3)-1(a)(4), Proced. & Admin. Regs.,

under which certain items relating to distributions by a partnership are defined as partnership items, and the illustration of those rules in section 301.6231(a)(3)-1(c)(3), Proced. & Admin. Regs.  However, contrary to petitioners' argument summarized above, we believe that the application of those rules to the subject adjustments under section 752(b) buttress our conclusion that the subject adjustments are partnership items.

As discussed above, the regulations define as partnership items certain items relating to distributions from the partnership "to the extent that a determination of such items can be made from determinations that the partnership is required to make".  Sec. 301.6231(a)(3)-1(a)(4), Proced. & Admin. Regs.  In connection with a distribution from the partnership, the partnership is required to determine "The amount of money distributed to a partner".  Sec. 301.6231(a)(3)-1(c)(3)(ii), Proced. & Admin. Regs.  The adjustments at issue in this case involve respondent's determination that petitioners made constructive distributions of money to various partners. Thus, the regulations upon which petitioners rely, section 301.6231(a)(3)-1(c)(3), Proced. & Admin. Regs., require petitioners to determine the very items at issue in these cases.

Moreover, we do not agree with petitioners' factual assertion that the settlement transaction with Admiral took place outside the partnership. To the contrary, the use of the investor notes as collateral for a loan from Northern Telecom and the involvement of Admiral as guarantor of the partnership's obligation to the lender was contemplated in the offering memorandum, the partnership agreement, the letter to Northern Telecom executed by each investor, and by the investor notes themselves. Additionally, under the Settlement Agreement, the transaction was structured as an abandonment of an investor's partnership interest to the partnership or as a conveyance of an investor's partnership interest to the partnership. Contrary to petitioners' assertion that the investor notes "were not partnership assets but were assets owned by Admiral", the balance sheets filed as Schedule L attached to the partnership's Form 1065, U.S. Partnership Return of Income, list the investor notes as partnership assets. Furthermore, contrary to petitioners' assertion that the settlement did not require the consent or notification of the partnership, the Settlement Agreement itself required the execution of an agreement between the trustee in bankruptcy and the limited partners who joined the settlement, and further required the settlement transaction to be approved by the Bankruptcy Court.

For the foregoing reasons, we find that petitioners have not carried their burden of proving that the adjustments determined by respondent are not partnership items, as defined by section 6231. Accordingly,

<u>Petitioners' Motion for Summary Judgment will be denied</u>.